**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SUPPLY CHAIN PRODUCTS, LLC,**

                      **Plaintiff,**

       **-against-**

**NCR CORPORATION,**

                 **Defendant.**

**19-CV-11376 (ALC)(JLC)**

**<u>OPINION AND ORDER</u>**

---

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Supply Chain Products, LLC ("Supply Chain", "SCP" or "Plaintiff") brings this suit against NCR Corporation ("NCR" or "Defendant") alleging two counts of breach of contract related to NCR's alleged failure to pay royalties to Plaintiff pursuant to a 2011 software license agreement. (*See generally* Compl., ECF No. 1-1.) Currently pending before the Court is Plaintiff's motion summary judgment and Defendant's motion for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (ECF Nos. 105, 117.) For the reasons that follow, both motions are **GRANTED IN PART** and **DENIED IN PART**.

<u>**BACKGROUND**</u>

**I.    Procedural History**

This action was removed to federal court on the basis of diversity jurisdiction on December 12, 2019. (ECF No. 1.) The Complaint alleges two causes of action for breach of contract. (Compl., ECF No. 1-1.) Count I seeks damages in connection with NCR's alleged non-payment of license and maintenance royalties provided for by the licensing agreement entered into by the parties. (*Id.* ¶¶ 40–50.) Count II seeks damages in connection with NCR's alleged violation of the licensing agreement's non-compete provision. (*Id.* ¶¶ 51–58.)

Defendant filed a motion for partial summary judgment on April 1, 2022. (ECF No. 96.) Plaintiff filed its motion for summary judgment the same day. (ECF No. 99.) Both Plaintiff and Defendant also filed motions to seal certain of the documents attached to its declaration in support of their motions. (ECF Nos. 105, 117.)

## II.    Relevant Facts

The following facts are taken from allegations contained in the Complaint, the parties' Rule 56.1 statements and the documents and affidavits submitted in support of their motions.

### A.    General Background

Supply Chain provides software and supply chain serves to customers in the retail and wholesale distribution industries, including an invoice reconciliation software program known as Balances. (Compl., ECF No. 1-1 ¶ 6.) NCR is a software company located in Atlanta, Georgia. (*Id.* ¶ 7.)

Invoice reconciliation is a business function that allows a purchaser to compare or match its cost or quantity information with the cost or quantity information that a purchaser receives from its vendor. (Pl. 56.1 Stmt., ECF No. 106 ¶ 3.) Balances is a "standalone" invoice reconciliation program that automatically performs a "3-way match" between a retailer's invoices, purchase orders, and receipts in order to resolve any potential discrepancies. (*Id.* ¶ 7; Def.'s 56.1 Stmt., ECF No. 112 ¶ 18.)

### B.    The Agreement

Supply Chain entered into a Software and OEM Distribution Agreement (the "Agreement") with Retalix USA, Inc. ("Retalix"), NCR's predecessor, on October 11, 2011. (Def.'s 56.1 Stmt., ECF No. 112 ¶ 1; Pl.'s 56.1 Stmt., ECF No. 106 ¶ 11.) At that time, in early 2011, Retalix owned Prompt, an earlier iteration of the invoice reconciliation functionality in Balances, and was also

developing new invoice reconciliation software that would improve on Balances' functionality. (*Id.* ¶¶ 2, 9.)  NCR acquired Retalix's parent company in 2013 and assumed its obligations under the Agreement.  (*Id.* ¶¶ 66–71.)

i.   *Schedule of License Royalties and Annual Maintenance Royalties*

As part of the Agreement, Retalix agreed that it would pay Supply Chain licensee royalties for sales of Balances to Retalix's customers, as well as an annual maintenance royalty.  (*Id.* ¶ 13.) The license royalty fee owed to Supply Chain would equal the greater of

> i) a percentage of the license fee that Retalix charged its customer: 75% if Balances was sold alone, or 25% if Balances was bundled with Purchasing (Retalix's new warehouse purchasing software), or

> ii) a minimum fixed amount: $150,000 if Balances was sold alone, or $100,000 if Balances was bundled with Purchasing.

(*Id.* ¶ 17.)  Retalix was also required to pay an annual maintenance fee to Supply Chain equal to 15% of the license fee it received from its customer.  (*Id.* ¶ 19.)

For some of NCR's customers, the parties agreed to revised royalty payment structure based on the number of locations at which Balances was used.  (*See, e.g.*, *id.* ¶¶ 55, 82, 94.)

ii.   *Non-Waiver and Non-Oral Modification Clauses*

The Agreement also includes a non-waiver and non-oral modification clauses.  (*Id.* ¶ 20.) In Section 11.6 of the Agreement, the parties agreed that "[t]he failure of a Party to insist upon strict performance of any provision of this Agreement or to exercise any right arising out of this Agreement shall neither impair that provision or right nor constitute a waiver of that provision or right, in whole or in part, in that instance or in any other instance."  (*Id.* ¶ 21.)  At Section 11.1, the parties agreed that "this Agreement cannot be modified or supplemented except in a writing expressly stated for such purpose and signed by SCP and Retalix."  (*Id.* ¶ 22.)  Additionally, the royalty schedule includes an agreement that modifications could only be made in writing.  (*Id.* ¶ 23

3

("Except as noted in this Agreement or mutually agreed upon in writing by both Parties, payments will be based upon the chart below. Terms of this schedule of fees and royalties may be modified on an individual customer basis by mutual agreement in writing between the Parties."))

     iii.    *Non-Compete Provision*

Section 4 of the Agreement contains a non-compete clause which provides that:

> 4.1. Retalix agrees that as of the Effective Date of this Agreement that it will cease any and all licensing or other distribution of the Retalix Invoice Reconciliation software (Prompt) and that for so long as Retalix continues to have a license to the SCP Software and Documentation under the terms of this Agreement, Retalix will not, subject to the exceptions listed in Sections 4.3 and 4.4 of this Agreement, by itself or in cooperation or though others, research, develop, acquire, market, sell, license, or in any way distribute any product that is similar to, whether in form or function, Prompt, invoice reconciliation, or SCP's Balances program.

> 4.2. Subject to and aside from the non-compete requirements and limitations of Section 4.1, nothing in this Agreement shall impair a Party's rights to use, market or distribute, without obligation to the other Party, similar ideas, concepts, software or products to those in the other party's software, which have been independently acquired or submitted by others to the Party, or which have been developed independently by the Party.

(*Id.* ¶¶ 33, 36.)

The non-compete provision contains two carve outs.  First, Section 4.3 provides that:

> Retalix reserves the right to continue offering Retalix Prompt customers existing as of the Effective Date of this Agreement additional licenses of the now-current version of the Prompt product and to continue to provide on-going support and professional services to those existing Retalix Prompt customers unimpeded by this Agreement."

(Frey Decl., Ex. 3, ECF No. 113-3 § 4.3.)  Second, Section 4.4 provides that:

> Retalix reserves the right to acquire a product similar in function to SCP's Balances™ program only as a part of an overall suite of software products that offer substantial functionality beyond the functionality of SCP's Balances™ (collectively the "Acquired

> Product Suite["]). Retalix shall only market, sell, license, or distribute the acquired functionality similar to SCP's Balances™ program and only as an integrated part of the Acquired Product Suite in existence at the time of the acquisition.

(*Id.* § 4.4.)

### C. Balances Licenses Sold by NCR to its Customers

Plaintiff alleges that NCR and/or Retalix sold Balances to ten customers for which it owes Supply Chain license royalties and annual maintenance royalties. These customers can be grouped into three categories: customers for which NCR allegedly owes (1) royalties for licenses sold in 2017 and 2018; (2) royalties for licenses sold before 2016; and (3) royalties for licenses at additional Giant Eagle and Fresh Thyme locations.

### i. Group One: Royalties Allegedly Owed for Licenses Sold in 2017 and 2018

NCR sold Balances licenses to five customers for which it alleges it is owed license royalties and annual maintenance royalties. NCR sold a license to Associate Growers of Baton Rouge ("AGBR") in December 2017 (*id.* ¶¶ 123), two licenses to Fairway Markets in December 2017 (*id.* ¶¶ 128, 130), one license to Earth Fare in December 2017 (*id.* ¶¶ 135, 137), one license to Piggly Wiggly in 2018 (*id.* ¶¶ 143, 145), and one license to Cardenas also in 2018 (*id.* ¶¶ 155, 157.) Supply Chain never received licenses royalties or maintenance royalties from NCR for these licenses. (*Id.* ¶¶ 124, 132, 140, 146, 158.)

### ii. Group Two: Royalties Allegedly Owed for NCR License Sales Made Before 2016

Plaintiff alleges that NCR has failed to pay license royalties and maintenance royalties for Balances licenses that NCR sold to five of its customers: Love's Travel Stop, Roche Bros., Giant Eagle, Kinney Drug and Fresh Thyme. (*Id.* ¶ 50–53, 57–61, 62–65, 84–87, 96–99.) Plaintiff notes that NCR paid the annual maintenance royalties it owed to Supply Chain for these customers prior between 2016 to 2020, but that NCR ceased paying royalties owed after 2020. (*Id.*)

iii.   *Group Three: Royalties Allegedly Owed for Licenses at Additional Giant Eagle and Fresh Thyme Locations*

Plaintiff also alleges that it is owed royalties arising from the use of Balances at additional locations for two NCR customers: Giant Eagle and Fresh Thyme.  (*Id.* ¶¶ 81–83, 93–95.)  The addendum to Schedule 1 in the Agreement for Giant Eagle requires NCR to pay Supply Chain $159,875 for two warehouses which are granted Balances licenses by NCR as well as an annual maintenance fee of $37,500.  (*Id.* ¶ 83.)  NCR paid Supply Chain the $159,875 license fee and $37,500 annual maintenance royalty.  (*Id.* ¶ 85.)  However, NCR has not paid Supply Chain for the additional six warehouses at which it allegedly granted Giant Eagle Balances licenses.  (*Id.* ¶ 89.)

The addendum to Schedule 1 for Fresh Thyme requires NCR to pay Supply Chain $45,500 for every 50 Fresh Thyme stores and one warehouse that use Balances, as well as an annual maintenance fee of $9,555.  (*Id.* ¶ 95.)  In March 2015, NCR sold Fresh Thyme a license to use Balances and eight other NCR software products (including DAX, HQ and Purchasing) at 50 stores and one warehouse.  (*Id.* ¶ 93.)  SCP learned through discovery that Fresh Thyme was using Balances at 71 stores.  (*Id.* ¶ 100.)  Thus, Supply Chain alleges that it is owed royalties for an additional 21 stores, per the parties' agreement to the addendum to Schedule 1.  (*Id.* ¶ 101.)  NCR also proffers an NCR invoice showing that it charged maintenance fees for the additional software products it licensed to Fresh Thyme alongside Balances for 90 Fresh Stores.  (Pl.'s Supp. 56.1 Stmt., ECF No. 122 ¶ 24.)

D.  Other Software Sold By NCR

While the Agreement was effective, NCR sold five software products that Plaintiff contends contain invoice reconciliation functionality—Power Enterprise, DAX, HQ, Power Mobile and Power Transport—in violation of the Agreement's non-compete provision.  (Pl.'s 56.1

Stmt., ECF No. 106 ¶¶185–230.)  Defendant disputes these facts, arguing that there are material facts in dispute about the definition of invoice reconciliation and whether these programs in fact contain that functionality.  (Def.'s Counter Stmt., ECF No. 125 ¶¶ 185–230.)

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is proper where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The moving party has the burden "to demonstrate that no genuine issue respecting any material fact exists."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994) (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  There is no issue of material fact where the facts are irrelevant to the disposition of the matter.  *See Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F. Supp. 2d 756, 761 (S.D.N.Y. 2013); *see also Anderson*, 477 U.S. at 248 (holding that a fact is material if it would "affect the outcome of the suit under the governing law").  "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal citations and quotation marks omitted).

In deciding a summary judgment motion, courts must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  *Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (citing *Anderson*,

477 U.S. at 255)).  Courts may not assess credibility, nor may they decide between conflicting versions of events, because those matters are reserved for the jury. *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (quoting *Anderson*, 477 U.S. at 252).

When considering a motion for summary judgment, a district court "must also be mindful of the underlying standards and burdens of proof ... because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Maco v. Baldwin Union Free Sch. Dist.*, 249 F. Supp. 3d 674, 678 (E.D.N.Y. 2017) (quoting *SEC v. Meltzer*, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006) (internal quotation marks omitted), *aff'd*, 726 F. App'x 37 (2d Cir. 2018)).  "Where the non-moving party would bear the ultimate burden of proof on an issue at trial, the burden on the moving party is satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim." *Id.* (quoting *Meltzer*, 440 F. Supp. 2d at 187) (internal quotation marks omitted).

"If there are cross-motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law." *Gen. Ins. Co. of Am. v. Starr Indem. & Liab. Co.*, No. 14-CV-7354, 2016 WL 4120635, at *4 (S.D.N.Y. July 22, 2016) (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).  "[W]hen both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc.*, 996 F.2d at 1461 (citation omitted).  Instead, the court must "evaluate each party's motion on its own merits, taking care in each instance to draw

all reasonable inferences against the party whose motion is under consideration." *Id.* at 1461 (citation omitted).

## DISCUSSION[1]

Supply Chain moves for summary judgment on Count I, arguing that the terms of the payment schedule are clear and that the Agreement does not allow for oral modification or waiver of any its terms, and Count II, arguing that the non-compete clause is valid and enforceable and that the definition of "invoice reconciliation" is not ambiguous. (*See generally* Pl.'s Mem., ECF No. 109.) Defendant argues that summary judgment is inappropriate because (1) NCR is not responsible for unauthorized usage of Balances by its customers; (2) Supply Chain's conduct demonstrates that there was an implied agreement to provide pricing concessions to NCR; (3) Supply Chain waived certain provisions of the Agreement or is estopped from enforcing them; (4) the non-compete clause does not apply to invoice reconciliation functionality; (5) "invoice reconciliation" is ambiguous as used in the Agreement and (6) the non-compete clause does not protect a legitimate business interest of Supply Chain. (*See generally* Pl.'s Opp'n, ECF No. 120.) Defendant further argues that it did not waive the limitation of liability on damages for lost profits contained in the Agreement. (*Id.* at 21–23.)

Defendant also moves for partial summary judgment, arguing that NCR does not owe royalties for the use of Balances by its customers at unauthorized locations and that the non-compete clause in the Agreement is impermissibly broad and unenforceable. (*See generally* Def.'s

---

[1] In the Second Circuit, judicial documents are afforded a presumption of public access. The weight of this presumption is "governed by the role of the material at issue" and the material's value to the public. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). The presumption must be balanced against competing factors, which include "the privacy interests of those resisting disclosure." *Id.* at 120. Having reviewed the contents of the sealed exhibits, I find that the confidentiality interests outweigh the value of the information to the public. Accordingly, Plaintiff's motion to seal at ECF Nos. 105 and 117 is **GRANTED**.

Mem., ECF No. 111.)  Plaintiff opposes the motion, arguing that NCR owes royalties based on the number of locations at which Balances is used and that the non-compete clause is enforceable and unambiguously applies to the sales of five invoice reconciliation products by NCR.  (Pl.'s Opp'n ECF No. 119.)

I.    **Count I: Breach of Contract for Unpaid Licenses**

A.  GROUP ONE:

The Court finds that Plaintiff has demonstrated that there are no material facts in dispute as to its claims for breach of contract against NCR for royalties due for Balances licenses sales made to AGBR, Fairway Markets, Earth Fare, Piggly Wiggly and Cardenas in 2017 and 2018. The Court finds that the clear terms of the contract prohibit oral modification and waiver, and that Defendant's arguments that Supply Chain agreed to a price concession, for estoppel, or for waiver are unavailing.

As a matter of law, to sustain a cause of action for breach of contract, a party must establish: (1) the formation of a contract as to its scope and terms; (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage.  *Sachs v. Zito*, 28 Misc. 3d 567, 573–574, 901 N.Y.S.2d 818, 824 (N.Y. Sup. Ct. 2010).  The parties agree that the Agreement is a valid and enforceable contract governing the dispute.

The Agreement clearly sets forth that royalties would be calculated as the greater of (1) a percentage of the licenses sold or (2) a minimum set amount.  (Pl. 56.1 Stmt., ECF No. 106 ¶ 17.) Additionally, Section 11.1 contains an unambiguous non-oral modification clause, stating that the Agreement "cannot be modified or supplemented except in a writing expressly stated for such purpose and signed by SCP and Retalix."  (*Id.* ¶ 22.)  Section 11.6 contains a clear non-waiver provision, stating that "[t]he failure of a Party to insist upon strict performance of any provision of

this Agreement or to exercise any right arising out of this Agreement shall neither impair that provision or right nor constitute a waiver of that provision or right, in whole or in part, in that instance or in any other instance." (*Id.* ¶ 21.)

Plaintiff has put forward documents showing NCR sold licenses for Balances to AGBR in December 2017, two licenses to Fairway Markets in December 2017, and one license to Earth Fare in December 2017, one license to Piggly Wiggly in 2018, and one license to Cardenas also in 2018 (*Id.* ¶¶ 123, 128, 130, 135, 137, 143, 145, 155, 157). It has also shown how royalties were calculated pursuant to the Agreement. (*Id.* ¶ 17.) There is also uncontroverted evidence that NCR has failed to pay the royalties due under the Agreement. (*Id.* ¶¶ 124, 132, 140, 146, 158.)

i.   *Written Modification to the Agreement*

NCR argues that a set of email exchanges between it and Supply Chain show that the parties agreed to alter the terms of the payment schedule set forth in the Agreement, and that NCR does not owe the amount of royalties calculated by Plaintiff. These emails purportedly show that NCR and Supply Chain discussed the pricing of Balances for NCR's customers, which Defendant posits satisfies the Agreement's requirement of a signed writing to modify any terms or, in the alternative, demonstrates the existence of an oral agreement to modify the terms of the Agreement. (Def.'s 56.1 Stmt., ECF No. 125 ¶¶ 263–270).

The Court finds that the emails do not satisfy the Agreement's requirement of modification by a signed writing. The emails do not indicate that Supply Chain and NCR agreed on a discount that should be offered to NCR's customers. NCR even concedes this in its opposition papers, characterizing the emails as "not contain[ing] explicit promise[s]…" (Def.'s Opp'n, ECF No. 120 at 5.) NCR does not even outline what the new terms of this alleged modification to the Agreement purportedly were and how the alleged new terms modify the payment schedule set forth in the

written Agreement.    NCR's contention that these emails somehow constitute a written modification are further undermined by the fact that the parties executed several written addendums memorializing modifications to the royalty payment schedules for other NCR customers.  (*See, e.g.,* Frey Decl., Ex. 3, ECF No. 102-3 (referring to the Agreement as an "AMENDMENT TO SOFTWARE LICENSE AND OEM DISTRIBUTION AGREEMENT".) Absent any indication that the parties came to an agreement as to a modification in the emails, the Court cannot construe these emails as an addendum to the Agreement's payment schedule.  *See Mellen & Jayne, Inc. v. AIM Promotions, Inc.*, 33 App. Div.3d 676, 677–78, 823 N.Y.S.2d 99, 100 (2d Dep't 2006) ("The doctrine of definiteness means that a court cannot enforce a contract unless it can determine what the parties agreed to do.").

      ii.     *Partial Performance, Estoppel and Waiver*

Defendant's arguments regarding partial performance, waiver and estoppel also fail. "Under New York law, a written agreement that proscribes oral modification can by changed only by a signed written agreement."  *Stichting v. Capstone Credit, LLC*, No. 21 CIV. 2102 (LGS), 2022 WL 18027614, at *5 (S.D.N.Y. Dec. 30, 2022).  However, an oral modification may still be enforceable where the party seeking to avoid compliance with the written requirement demonstrates that either partial performance or that equitable estoppel applies.  *Baraliu v. Vinya Cap., L.P.*, 765 F. Supp. 2d 289, 297 (S.D.N.Y. 2011).  The partial performance exception applies, "only if the partial performance be unequivocally referable to the oral modification."  *Stichting*, 2022 WL 18027614, at *6 (internal citations omitted).  Estoppel may apply "when a party's conduct induces another's significant and substantial reliance on the agreement to modify, albeit oral, that party may be estopped from disputing the modification notwithstanding the statute."  *Id.*

Again, Defendant has failed to show that there was an oral modification to the contract

such that partial performance or equitable estoppel would apply.  *See Wechsler v. Hunt Health Sys., Ltd.*, 186 F. Supp. 2d 402, 411 (S.D.N.Y. 2002) ("[T]he Court finds as a threshold matter that defendants have failed to define adequately the contours of [an oral] modification.")  Defendant has not explained what the oral modification was, when it was allegedly made, and how it altered the terms of the Agreement.  Moreover, the Agreement has a clear non-waiver provision, and Defendant has put for no evidence showing that Plaintiff voluntarily and intentionally abandoned its rights.  *Norwest Fin., Inc. v. Fernandez*, 86 F. Supp. 2d 212, 230 (S.D.N.Y. 2000).

Accordingly, Defendant's arguments fail and Plaintiff's motion for summary judgment as to these customers is **GRANTED**.

## B.  GROUP TWO

The Court finds that Plaintiff has demonstrated that NCR has failed to pay maintenance payments owed to Supply Chain for Balances licenses NCR sold to five of its customers—Love's Travel Stop, Roche Bros., Giant Eagle, Kinney Drug and Fresh Thyme—for royalties owed for 2020 and 2021.  (*Id.* ¶¶ 50–53, 57–61, 62–65, 84–87, 96–99.)  Defendant concedes that it owes unpaid royalties to Supply Chain for these customers.  (Def.'s Opp'n, ECF No. 120 at 3 n.4.)  Thus, because Plaintiff has satisfied the elements of a breach of contract as to these customers, and there are no material facts in dispute, Defendant's motion for summary judgment is **GRANTED** as to these customers.

## C.  GROUP THREE

Supply Chain asserts that it learned through discovery that Giant Eagle uses Balances at eight of its warehouses, even though NCR has only paid Supply Chain royalties for two warehouses.  (Pl.'s 56.1 Stmt. ¶ 88.)  Likewise, Supply Chain asserts that it learned during discovery that Thyme Fresh was using Balances at additional locations for which NCR owed

additional royalty payments. (*Id.* ¶¶ 100–104.) Defendant argues that these uses of Balances were not granted or authorized by NCR, and thus NCR need not pay royalties to Supply Chain for these additional locations.

i.   <em>Royalties for Use of Balances at Unauthorized Locations</em>

Defendant moves for partial summary judgment on the question of whether it is obligated to pay Supply Chain royalties for unauthorized usage of Balances by Giant Eagle and Fresh Thyme. (Def.'s Mem., ECF No. 111 at 5–6.) Defendant argues that the Agreement only requires NCR to pay Supply Chain for Balances licenses that are "granted" or "sold" to its customers and that NCR cannot be held responsible for the alleged wrongful use of Balances by its customers. (*Id.*) Plaintiff argues that the parties executed written addenda to the payment schedules for Giant Eagle and Fresh Thyme wherein NCR agreed to pay royalties based on the number of locations at which the Balances software was used and thus NCR owes royalties to Supply Chain for each location at which Balances is used, regardless of whether the use was authorized by NCR. (Pl.'s Opp'n, ECF No. 119 at 3–4.) In the alternative, Plaintiff argues that NCR did authorize its customers to use Balances at these additional locations. (*Id.* at 6–7.)

The Court finds that the Agreement only requires NCR to pay royalties for Balances licenses that it grants or authorizes. On a motion for summary judgment, the court is tasked with interpreting a contract should seek "to give effect to the intent of the parties as revealed by the language of their agreement." *Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 467 (S.D.N.Y. 2007) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)). Summary judgment is appropriate where the language of the contract is "'wholly unambiguous.'" (*Id.* (quoting *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir. 1994)). No ambiguity exists when contract language

14

has "definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Kennedy v. Basil*, 531 F. Supp. 3d 828, 841 (S.D.N.Y. 2021) (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280, 1282 (1978) (citations omitted)). Additionally, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989).

The Agreement is unambiguous.  Section 5.1 of the Agreement provides that "[i]n consideration of the rights granted to Retalix hereunder, Retalix agrees to pay SCP Royalties as specified in Schedule 1 hereto for each license of [Balances] ***granted*** by Retalix or its resellers during the terms of this Agreement." (Frey Decl., Ex. 3, ECF No. 113-3 at § 5.1 (emphasis added).) The parties also entered into written addenda, modifying the default payment structure in the Agreement, whereby NCR was obligated to pay $159,875 for every two Giant Eagle warehouses that used Balances and $45,500 for every 50 Fresh Thyme stores and one warehouse that used Balances.  (Pl.'s 56.1 Stmt., ECF No. 106 ¶¶ 83, 95.)  Although the addenda modify the payment structure set forth in the Agreement in Schedule 1, these addenda do not modify Section 5.1 of the Agreement which clearly and unambiguously only obligates NCR to pay royalties for licenses that are "granted" by NCR.  Supply Chain has provided no basis on which the Court may read in an additional requirement into the contract that would require NCR to pay royalties for licenses of Balances which it did not grant.  *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 248 (2d Cir. 2020) ("[W]e may not … read additional requirements into unambiguous text in search of such an obligation.")  Such a reading could produce the absurd result of NCR somehow owing royalties for its customers' use of Balances which the customers

15

had procured from a source other than NCR, or even directly from Supply Chain itself.  *Alpha Cap. Anstalt v. Real Goods Solar, Inc.*, 311 F. Supp. 3d 623, 629 (S.D.N.Y. 2018) ("A contract should not be interpreted to produce a result that is absurd.") (quoting *Lipper Holdings v. Trident Holdings*, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561 (1st Dep't 2003)).  Accordingly, Defendant's motion for partial summary judgment stating that it is only responsible for royalties for licenses it sells or authorizes is **GRANTED**.

Next, The Court finds that there is a genuine issue of material fact over whether NCR did authorize or grant Balances licenses to additional Giant Eagle and Fresh Thyme locations.

As to Giant Eagle, the addendum to Schedule 1 in the Agreement for Giant Eagle requires NCR to pay Supply Chain $159,875 for every two warehouses which are granted Balances licenses by NCR as well as an annual maintenance fee of $37,500.  (*Id.* ¶ 83.)  In March 2014, NCR sold Giant Eagle a license to use Balances at "2 full service Distribution Centers and 5 satellite facilities."  (Pl.'s 56.1 Stmt. ¶ 81.)  Plaintiff maintains that distribution centers are synonymous with warehouses.  (Pl.'s Supp. 56.1 Stmt., ECF No. 122 ¶ 23.)  A Giant Eagle representative testified at his deposition that the company uses Balances software at eight of warehouses, and thus Plaintiff maintains it is owed royalties for the additional six warehouses that are using a license of Balances.  However, Plaintiff has not established any facts showing that NCR granted these additional licenses to Giant Eagle.  Defendant maintains that the additional locations that are using Balances is unauthorized.

As to Fresh Thyme, Plaintiff has put forward evidence showing that the addendum to Schedule 1 for Fresh Thyme requires NCR to pay Supply Chain $45,500 for every 50 Fresh Thyme stores and one warehouse that use Balances, as well as an annual maintenance fee of $9,555.  (*Id.* ¶ 95.)  In March 2015, NCR sold Fresh Thyme a license to use Balances and eight other NCR

software products (including DAX, HQ and Purchasing) at 50 stores and one warehouse.  (*Id.* ¶ 93.)  SCP purportedly learned through discovery that Fresh Thyme was using Balances at 71 stores.  (*Id.* ¶ 100.)  Thus, Supply Chain alleges that it is owed royalties for an additional 21 stores, per the parties' agreement to the addendum to Schedule 1.  (*Id.* ¶ 101.)  Supply Chain also proffers an NCR invoice showing that it charged maintenance fees for the additional software products it licensed to Fresh Thyme alongside Balances for 90 Fresh Stores.  (Pl.'s Supp. 56.1 Stmt., ECF No. 122 ¶ 24.)

However, these facts do not conclusively determine that NCR granted additional Balances licenses to Fresh Thyme.  The invoice itself does not reference Balances and Plaintiff has not put forward any evidence indicating that these additional software programs would only have been sold by NCR to Fresh Thyme alongside Balances.  Additionally, it is not clear from the record whether Balances is used at 71 Fresh Thyme stores as asserted in Plaintiff's Rule 56.1 Statement (Pl.'s 56.1 Stmt., ECF No. 106 ¶ 100) or 90 stores as it asserts in its Supplemental Rule 56.1 Statement.  (Pl.'s Supp. 56.1 Stmt., ECF No. 122 ¶ 24.)  Moreover, the portion of the deposition transcript of Fresh Thyme's 30(b)(6) witness, on which Supply Chain bases its assertion that Balances was used in 71 Fresh Thyme stores, merely states that Fresh Thyme operates **70** total stores without specifying that the Balances software was used at all 70 of those stores.

Accordingly, the Court finds that is a genuine dispute as to whether NCR granted Fresh Thyme and Giant Eagle additional Balances licenses and, if so, how many additional licensees it granted.  Plaintiff's motion for summary judgment as to the royalties owed by NCR for Fresh Thyme and Giant Eagle is **DENIED**.

## II.    Count II: Breach of the Non-Compete Clause

Defendant moves for partial summary judgment as to the non-compete (or restrictive

covenant) in the Agreement, asking the Court to find that it is unenforceable as a matter of law. (Def.'s Mem., ECF No. 111 at 6.)  Plaintiff asks the Court to find that Defendant violated the non-compete by continuing to sell five software products which were "similar to, whether in form or function, Prompt, invoice reconciliation, or SCP's Balances program."  (Def.'s Mem., ECF No. 109 at 3.)  Plaintiff moves for summary judgment on Count II, arguing that the non-compete clause is enforceable and that Defendant violated it by selling software containing invoice reconciliation functionality while the Agreement was operative.  (Pl.'s Mem., ECF No. 109.)

"Whether a restrictive covenant is enforceable depends in part upon the nature of the underlying contract.  *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F.Supp.2d 192, 196 (E.D.N.Y. 1999).  New York courts have enforced restrictive covenants in three kinds of contracts: (1) contracts for the sale of businesses; (2) employment contracts; and (3) ordinary commercial contracts.  *Navajo Air, LLC v. Crye Precision, LLC*, 318 F. Supp. 3d 640, 649 (S.D.N.Y. 2018), *as amended* (Aug. 2, 2018) (citing *Mathias v. Jacobs*, 167 F.Supp.2d 606, 610 (S.D.N.Y. 2001)). Here, the non-compete clause is in an ordinary commercial contract which is analyzed "under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract."  *Id.* (quoting *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F.Supp.2d 192, 197 (E.D.N.Y. 1999)).  Thus, a court examines the "totality of the circumstances" to consider whether the clause "(1) protects a legitimate business interest; (2) is reasonable in regard to geographic scope and temporal duration; and (3) the degree of hardship imposed upon the party against whom the covenant is enforced."  *Id.* (quoting *Crye Precision LLC v. Duro Textiles, LLC*, 2016 WL 1629343 at *5 (S.D.N.Y. 2016), *aff'd* 689 Fed. Appx. 104 (2d Cir. 2017)).

Here, pursuant to the non-compete clause, "NCR cannot sell software similar in form or function to Balances or invoice reconciliation."  (Def.'s Mem., ECF No. 109 at 11.)  Specifically,

it prevents NCR from selling any product that contains invoice reconciliation functionality.  (Pl.'s 56.1 Stmt. ¶ 33; Frey Decl., Ex. 3, ECF No. 113-3 § 4.1.)  This prohibition applies equally to products "which have been developed independently by the Party."  (Pl.'s 56.1 Stmt. ¶ 36; Frey Decl., Ex. 3, ECF No. 113-3 § 4.2.)  In other words, the non-compete also applies to any of NCR's invoice reconciliation products that it develops and markets independently.  The clause does, however, have two important carve outs.  First, Retalix/NCR was permitted to sell its existing Prompt customers an additional license "of the now-current version of Prompt."  (Pl.'s 56.1 Stmt. ¶ 38; Frey Decl., Ex. 3, ECF No. 113-3 § 4.3.)  Second, Retalix/NCR was permitted to sell software that it subsequently acquired "only as a part of an overall suite of software products" so long as that software "offer[s] substantial functionality beyond the functionality of SCP's Balances." (Pl.'s 56.1 Stmt. ¶ 39; Frey Decl., Ex. 3, ECF No. 113-3 § 4.4.)

Plaintiff argues that the non-compete provision is legitimate because it was negotiated in order to protect Supply Chain's "goodwill and its proprietary information related to its software." (Pl.'s Mem., ECF No. 109 at 12.)  Plaintiff also asserts that it has a legitimate interest in preventing NCR from competing with the joint venture between Supply Chain and NCR to sell Balances. (Pl.'s Opp'n, ECF No. 119 at 11–12.)[2]  Defendant argues that the non-compete clause "functions as a blanket prohibition on any competition, lawful or otherwise."  (Pl.'s Mem., ECF No. 111 at 7.)

Based on the totality of the circumstances, the Court finds that the non-compete clause in the Agreement is not enforceable since it is unreasonable in scope.  First, the Court finds that the

---

[2] In support of this position, Plaintiff largely relies on out of circuit decisions from the 19th Century (*see id.* at 10–12 (citing *United States v. Addyston Pipe and Steel Co.*, 85 F. 271 (6th Cir. 1898) and *Hodge v. Sloan,* 107 NY 244, 248 (1887)), which the Court finds unpersuasive and inapplicable to the facts of the present case.

non-compete clause over-reaches regarding the Plaintiff's protection of a legitimate business interest. A "covenant may not merely insulate a party from competition…" *Navajo Air, LLC*, 318 F. Supp. 3d at 650. While, "unfair competition" may be considered a legitimate business interest, *DAR & Assocs., Inc.*, 37 F.Supp.2d at 198, Plaintiff has not articulated how the non-compete guards against *unfair* competition. Likewise, although Plaintiff may have a legitimate business interest in protecting proprietary information, this is accomplished by other provisions in the Agreement, namely the "Confidentiality" provision in Section 6.2, which limits the disclosure of any confidential information Defendant may obtain through the course of the parties' business arrangement and limits the use of that information solely for the purpose of effectuating the parties' joint business. (Frey Decl., Ex. 3, ECF No. 113-3 at § 6.2.) Lastly, Plaintiff argues that it has a legitimate business interest in protecting its goodwill, but, again, does not articulate how exactly the non-compete clause mitigates against this risk and how Supply Chain's goodwill would even be implicated if NCR sold other software products with invoice reconciliation functionality.

Second, the Court finds that the non-compete is appropriately limited in temporal scope, but not in geographic scope. Because the non-compete is only effective while the Agreement is in effect, there are no concerns regarding the temporal scope of the Agreement. The Agreement does not, however, have any geographic limitation, and thus burdens NCR regardless of where it may wish to sell or market invoice reconciliation software, regardless of whether those are locations in which Supply Chain actually competes.

Third, the Court finds that the non-compete imposes an undue degree of hardship on NCR. The clause is impermissibly broad in scope and unduly burdensome. The non-compete clause applies to "any and all licensing or other distribution" of a "product that is similar to, whether in form or function, Prompt, invoice reconciliation, or SCPs Balances[] program." (Frey Decl., Ex.

3, ECF No. 113-3 at § 4.1.)  According to Plaintiff, the meaning of "invoice reconciliation" is plain: "[i]t is a business function that compares costs and/or quantity information the buyer has with cost and/or quantity information from the seller."  As Defendant points out, a limitation on NCR's ability to market or sell any program with such an expansive definition implicates a broad array of software and programs, which may or may not be similar to Balances.  The clause does not provide sufficient notice to NCR of what types of programs may actually be similar to Balances "in form or function"—an ambiguity which is highlighted by the parties' own factual dispute over whether the five NCR software products at issue are in fact similar to Balances and/or contain invoice reconciliation functionality.  Such a vague and overbroad non-compete clause is not enforceable.  *Crye Precision LLC v. Duro Textiles, LLC*, No. 15-CV-1681 (DLC), 2016 WL 1629343, at *5 (S.D.N.Y. Apr. 22, 2016), *aff'd*, 689 F. App'x 104 (2d Cir. 2017).  During negotiations, NCR's representative noted the risk to NCR posed by a non-compete clause, specifically that if "SCP didn't deliver well, we have customer contracts that require us to deliver a[n invoice reconciliation] solution."  (Pl.'s 56.1 Stmt., ECF No. 106 ¶ 36.)

Weighing these facts and applying the simple rule of reason, the Court finds that the non-compete provision is overly broad in scope and not aimed at a legitimate business interest, and thus unenforceable.  The crux of Plaintiff's arguments vis-à-vis the non-compete clause appears to be that NCR allegedly marketed and sold products that could compete with Balances.  However, Plaintiff has not articulated how the provision guards against *unfair* competition rather than simply restraining all potential competition whatsoever.  *Calico Cottage, Inc.*, 2014 WL 4828774, at *7.  Moreover, Plaintiff has not articulated how the provision would guard against loss of goodwill and why the Agreement's confidentiality provision is insufficient to guard against the risk of misappropriation of its confidential information.  Accordingly, Defendant's motion for summary

judgment on this issue is **GRANTED** and Plaintiff's motion is **DENIED**.[3]  *See Crye Precision LLC*, 2016 WL 1629343, at *4.

### III.    Attorney's Fees

The Court declines to consider any application for fees at this juncture, particularly because Plaintiff's application does not include its attorney billing records or other affidavits or declarations that would allow the Court to grant such an application.  *See Ion Audio, LLC v. Bed, Bath & Beyond, Inc.*, No. 15-CV-8292 (KMW), 2019 WL 1494398, at *11 (S.D.N.Y. Apr. 2, 2019); *See also Hugee v. Kimso Apartments, LLC*, 852 F. Supp. 2d 281, 291 (E.D.N.Y. 2012) ("The burden is on the party seeking attorney's fees to submit sufficient evidence to support the hours worked and the rates claimed); *see also Scott v. City of New York*, 643 F.3d 56, 57 (2d Cir. 2011) (awards of reasonable attorneys' fees require contemporaneous billing records).  Plaintiff may renew its motion for attorney's fees at conclusion of this action.

## <u>CONCLUSION</u>

For the reasons stated above, the motions for summary judgment are **GRANTED IN PART** and **DENIED IN PART**.  The parties are directed to file a joint status report as to next steps in this action within 21 days of this order.  The Clerk of Court is respectfully requested to terminate the pending motions at ECF Nos. 96, 99, 105, and 117.

**Dated:  March 30, 2023**
       **New York, New York**
                                     **ANDREW L. CARTER, JR.**
                                     **United States District Judge**

---

[3] The Court declines to "blue pencil" the non-compete clause by cutting it down to an appropriate scope.  There is not a sufficient factual record regarding the software capabilities and functions for the various software programs at issue in this litigation in order for the Court to make an informed decision regarding the appropriate scope of the limitation.  *See Crye Precision LLC*, 2016 WL 1629343, at *6.